UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA M. BERGER,

                Plaintiff,                      Case No. 18-11180

v.                                         Paul D. Borman
                                         United States District Judge

AUTOMOTIVE MEDIA, LLC
d/b/a i.M. BRANDED,

                Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 30)

This case involves Plaintiff Laura Berger's claims of alleged Family Medical Leave Act violations and state law disability discrimination against her former employer, Defendant Automotive Media, LLC d/b/a i.M. Branded. Plaintiff was employed as a Project Manager by Defendant for approximately 16 months. She took a three-week FMLA leave due to the stress of the job. During that time, her supervisor allegedly received complaints about the accounts handled by Plaintiff, and when Plaintiff returned from leave, she was placed on a 60-day Performance Improvement Plan ("PIP"). Plaintiff's employment was terminated prior to the conclusion of the PIP's 60-day period. Plaintiff alleges that Defendant perceived

1

her as disabled because she had taken FMLA leave and that both the PIP and her termination were a result of discrimination and retaliation in violation of the FMLA.

Now before the Court is Defendant's motion for summary judgment, in which it argues that Plaintiff's claims are without merit and should be dismissed as a matter of law. The motion is fully briefed and the Court held a telephonic hearing on June 9, 2020. For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendant's motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

Defendant i.M. Branded is a Michigan-based company that creates and produces graphic displays and commercial furniture and millwork for automotive clients. It was founded by its Chief Executive Officer and President Jim Whitehead, who became the sole owner after buying out his partner, Penske Automotive Group, in December of 2016. (ECF No. 30-4, Jim Whitehead Deposition Tr. at pp. 10, 12, 14, PgID 477-78.)

### 1.     Plaintiff is Hired at i.M Branded

Plaintiff was hired at Defendant i.M. Branded in August 2016 as a Senior Project Manager, and she became a Director of Client Services in October 2016 when the department was reorganized. (ECF No. 30-3, Laura Berger Deposition Tr.

2

at pp. 54, 66-67, PgID 396, 399; ECF No. 30-6, Craig Seppey Deposition Tr. at pp. 64-66, PgID 555-56.)  At that time, Robin Ellis became Plaintiff's first direct report. (Berger Dep. at p. 67, PgID 399.)

In January 2017, Lindsey Pustulka was hired at Defendant, also as a Director of Client Services.  (ECF No. 30-12, Lindsay Pustulka Deposition Tr. at p. 10, PgID 622.)  By March of 2017, Plaintiff had three Project Managers reporting to her, Ellis, Eric Frontiera, and Lisa LaFramboise.  (Berger Dep. at p. 71, PgID 400; ECF No. 30-5, 4/17/17 Organizational Chart, PgID 537.)

Mercedes-Benz AMG ("AMG") became a client of Defendant in early 2017, and Plaintiff was assigned that account.  (Pustulka Dep. at pp. 55-56, PgID 633.) AMG had previously contracted with another vendor, a competitor of Defendant's, but the account was granted to Defendant when the other vendor's "final product was not up to [AMG's] expectations."  (Whitehead Dep. at p. 105, PgID 500; *id.* at p. 106, PgID 501 (agreeing that i.M. Branded was "brought on to fix a problem that another competitor had caused").)   AMG was also working with a third-party management company named JLL, that was responsible for engaging and signing up dealerships for AMG.  (Berger Dep. at p. 126, PgID 414; Whitehead Dep. at pp. 108-09, PgID 501-02.)

3

### 2.    April 2017 Meeting

On or about April 11, 2017, Ellis sent an email to Craig Seppey, the Human Resources Manager, stating "[p]er your request the following are items that I feel are important to address with regards to the performance of Laura Berger." (ECF No. 30-7, 4/11/2017 Ellis email to Seppey, PgID 607-08.) Ellis complained that Plaintiff was unproductive as a manager and unable to lead the team, in large part due to Plaintiff's inability to fully understand the Tradesoft software they were using. (*Id.*) She did not consider Plaintiff to be a "working" manager because she lacked the knowledge to "completely take a job from beginning to end," and complained that Plaintiff "does not fully 'Follow things Through.'" (*Id.*)

Around that same time, Kristie Shepard, a peer of Plaintiff's, raised concerns to Whitehead regarding some things she observed with respect to Plaintiff's "engagement with [her] group," suggesting that Whitehead "keep an eye on" these issues. (Whitehead Dep. at p. 79, PgID 494.)

On April 21, 2017, Whitehead and Seppey met with Plaintiff to discuss her role as a manager and the roles of those on her team. (Whitehead Dep. at pp. 82-83, 88-90, PgID 495, 496-97; Seppey Dep. at pp. 82-89, PgID 560-61; Berger Dep. at pp. 92-94, PgID 405-06; ECF No. 30-8, Seppey Notes, PgID 610.) They discussed the information that was brought to their attention by Ellis. (Seppey Notes, PgID

4

610.)  Whitehead emphasized to Plaintiff the importance of understanding how to fully use the Tradesoft software, which "is a key tool to the success of [her] department[.]"  (*Id.*)  Whitehead further testified that Frank Stack, who ran the TradeSoft training sessions at Defendant, later also complained to him that Plaintiff is "not coming to these meetings, she is not learning the system, and everyone else is[.]"  (Whitehead Dep. at p. 82, PgID 495.)  Whitehead told Plaintiff that she needed to be more supportive of her team and that he needed to see a big improvement.  (*Id.* at p. 92, PgID 497.)  He also told her "This has got to change.  You are losing your team."  (*Id.* at p. 82, PgID 495.)  Whitehead asked Pustulka to assist in supporting Ellis to relieve some of the tension in group. (Whitehead Dep. at pp. 91, 95, PgID 497-98.)

Plaintiff, however, testified that Whitehead only reported to her that it was "[j]ust Robin [Ellis] complaining" and that he "take[s] 95 percent of what she says as sour grapes."  (Berger Dep. at pp. 93-94, PgID 405-06.)  Whitehead also asked Plaintiff to "show [Ellis] that you can use [Tradesoft] to the satisfaction that she's looking for" and "[g]et your skills a little brushed up."  (*Id.* at p. 94, PgID 406.)  She testified that she believed she was "able to execute Tradesoft to the satisfaction of [her] job" and that "[t]here was no issue.  There was nothing to address."  (*Id.* at p. 95, PgID 406.)

5

### 3.   August 2017 Meeting

In June, July and August of 2017, Plaintiff informed Whitehead and others on her team in a series of emails regarding the status of the AMG account and challenges she was facing, including challenges with JLL, the vendor on the project. (ECF Nos. 32-6 to 32-9, Plaintiff's emails, PgID 1231-40.)

On Monday, August 28, 2017, Whitehead and Seppey met with Plaintiff, at her request, to discuss concerns she was expressing regarding her workload. (Berger Dep. at pp. 99-101, PgID 407.) Plaintiff said she requested the meeting because her team was "already slammed" and she felt that she "needed [additional] resources to effectively handle the amount of work that was coming down the pike." (*Id*. at p. 101, PgID 407.) According to Seppey's notes from the meeting, Plaintiff stated that she needed "resources for more manpower," and that "she does not want more people but feels she needs additional staff." (ECF 30-9, Seppey's 8/28/17 Notes, PgID 612.) According to Plaintiff, Whitehead told her, "Just give me a day and I'll get back to you." (Berger Dep. at p. 105, PgID 408.)

On Friday, September 1, 2017, Whitehead announced that, effective immediately, Lindsay Pustulka would be "assum[ing] the role of Executive Director of Program Management" and that Plaintiff, along with two others, would be reporting directly to her. (ECF No. 30-11, 9/1/2017 Memorandum, PgID 617.)

Plaintiff stated that she thought this was a good solution and she was pleased with the change.  (Berger Dep. at pp. 106-07, PgID 409.)  Plaintiff was looking for some work-life balance for her team and felt that the change would help. (*Id.* at pp. 108, 111, PgID 409-10.)

### 4.    Pustulka Began Assisting with the AMG Account

Pustulka testified that, from her perspective, the organizational change was also designed to create unity and consistency to "get everybody all on the same playing field."  (Pustulka Dep. at pp. 72-73, PgID 637-38.)  Pustulka implemented changes early on, including cross-training everyone across the many different brands, to "create a nice sense of unity among all the project managers."  (*Id.* at pp. 83-84, PgID 640.)  She asked each individual Director what they needed from her in her new position, and she recalled Plaintiff asking for "additional support for AMG." (*Id.* at pp. 93-94, PgID 643.)  In response, Pustulka "divided up the AMG program to spread out the work a little bit more so that it could be managed better."  (*Id.* at pp. 95-96, PgID 643.)  She said she "dictated certain things to be off-loaded," and she "took on certain things." (*Id.* at p. 95, PgID 643.)  Frontiera remained the Project Manager assigned to the AMG account, and Pustulka assigned LaFramboise and Ellis to assist.  (*Id.* at pp. 95-96, 158-59, PgID 643, 675.)

During September 2017, Pustulka's main focus was the AMG program because "it was the one that was needing the most attention at that time." (Pustulka Dep. at p. 125, PgID 667.) As she got into the AMG account, Pustulka started to have some concerns about the way it was being managed, testifying:

> [T]he feedback from the installer, the feedback from the field measurers that I was now seeing for the first time and hearing, the way the conference calls went, the way the client answered and directed on the conference calls, the way [Frontiera] was responding in the whole scheme of things, the way that stuff was put in ProjectPAK and ShopPAK didn't make sense to me from my standpoint.

(Pustulka Dep. at p. 118, PgID 649.) Pustulka sensed that people were being kept "in the dark," testifying:

> I feel that our installers were not given all the proper paperwork when they went on job sites. I felt that … JLL was left in the dark … as to the details of the individual projects and key information that they needed. I would say that the site surveyor, Steve Deckard, was in the dark a lot as far as floor plans which he was to receive prior to sites, giving him the information he needed to do proper site surveys and field measures…. [Frontiera] was in the dark a lot of times based on what he was responsible for and the information he needed. From what I saw, he had a lot of questions because he didn't have … the full story of everything.

(*Id.* at pp. 149-50, PgID 673.)

That same month, Pustulka expressed her concerns to Whitehead "about the way the program was being managed." (*Id.* at pp. 115, 177, PgID 648, 680.) She also met with Plaintiff:

8

> Once I had more view into the AMG program, I was addressing my
> concerns with [Plaintiff] as to why she was doing things in a certain
> way, which was not something that, to me, made sense. It didn't look
> like it was working.  It looked as if [Plaintiff] was struggling with the
> clients and the workload in general… [a]nd it wasn't flowing as it
> should. …  So I had spoken to [Plaintiff] about why she was doing
> certain things, why certain things were and were not into TradeSoft,
> things like that.

(Pustulka Dep. at pp. 175-76, PgID 679.)

### 5.      Plaintiff Takes FMLA Leave

Plaintiff felt that the stress of her workload was affecting her mental well-being and that she was having a hard time "emotionally," and on October 3, 2017, Plaintiff met with Seppey, discussed the possibility of taking FMLA leave, and requested FMLA paperwork.  (Seppey Dep. at pp. 120-21, PgID 569-70; Berger Dep. at pp. 135-37, PgID 416.)  On October 9, 2017, Plaintiff turned in her FMLA paperwork signed by her doctor, and she was approved for three weeks of FMLA leave.  (Berger Dep. at p. 136, PgID 416; Seppey Dep. at pp. 122-23, PgID 570; ECF No. 30-13, FMLA Certification Form, PgID 721-28.)

Plaintiff's FMLA leave started the next day, and continued through October 31, 2017.  (FMLA Certification Form, PgID 721-28.)  That FMLA paperwork listed the "relevant medical facts" "related to the condition for which [Plaintiff] seeks leave" as "tightness in chest, emotional, interference with daily activities including

sleep, decreased effectiveness/productivity," and stated that Plaintiff is "unable to perform" "all job functions."  (*Id.* at PgID 722.)

Seppey advised Whitehead and Pustulka that Plaintiff was going to be on leave, but did not tell either of them, or anyone else in the company, the reason for her leave.  (Seppey Dep. at pp. 126-27, PgID 571.)   As to Whitehead, Seppey testified:

> I remember telling him that I just met with Laura, and she needs to go on a medical leave….  And he said, "Is she okay?"  And I said, "From what I can tell, she probably will be, but I don't know.  We'll know more if she returns from her medical leave."  And he said, "Okay."  And … "Make sure she has everything she needs," and we moved on.

(*Id.* at p. 126, PgID 571.)  According to Defendant, until the time the lawsuit was filed, Seppey was the only person in the Company who knew anything about the reason for Plaintiff's leave of absence, and all that he knew was what was contained on the Medical Certification Form and that she anticipated being off work for three weeks.  (Def.'s Mot. at p. 8, PgID 356; FMLA Certification Form, PgID 721-28.)

 While Plaintiff was on leave, Pustulka became more involved with Plaintiff's projects and discovered problems with those accounts.  Specifically, regarding the AMG program, Pestulka testified:

> Laura was the main communicator with JLL in that time frame of September [2017]….  In October, when I started to communicate with the client more directly and taking the lead on AMG, I was brought to

light different situations, different comments from JLL, from installers, and from our site surveyors about what they were in the dark about.

*** 

[JLL] had indicated their satisfaction with a new process I had put in place as far as a spreadsheet, that they were able to see every step of the process, and they had indicated on a conference call and in an email that this was something that they had been waiting for and that they were very excited to have a tool like this to help them do their job better.

(Pustulka Dep. at pp. 152-53, PgID 673-74.)  Pustulka stated that "there was just an overall dissatisfaction in the way the [AMG] program was ran" and Plaintiff was identified as "the source of their frustration."  (*Id.* at pp. 154-55, PgID 674.)  Pustulka testified that multiple dealers reported to her that there were unresolved issues with their installations that had previously been communicated to Plaintiff.  (*Id.* at pp. 159-60, 162, PgID 675-76.)

Pustulka reported that Plaintiff's three direct reports also complained to her about Plaintiff's performance while she was on leave.  Specifically, Frontiera complained to Pustulka about "overall program organization," that Plaintiff's communication was sporadic, and that he felt "unled" and did not have someone to turn to when he was "under water."  (Pustulka Dep. at pp. 191-92, PgID 683.) LaFramboise complained that Plaintiff lacked an understanding on how to do certain things and could not assist her, and stated that she was using the opportunity during Plaintiff's leave to ask questions of Pustulka to "fill in the holes that were in place

11

in her programs." (*Id.* at pp. 196-97, PgID 684-85.)  Ellis raised complaints similar to Frontiera and LaFramboise, that she felt "misguided" and with a "lack of support" from Plaintiff.  (*Id.* at p. 199, PgID 685.)

In addition, Pustulka reported that others within the Company also expressed concerns regarding Plaintiff, including Steve Deckard, the Field Supervisor, who complained that Plaintiff provided incomplete information to him for his site visits, that he could not get answers or information from her necessary to do his job, and that he preferred not to work with her in the future. (Pustulka Dep. at pp. 201-02, PgID 686.)  Installers also complained that Plaintiff did not provide the installation prep information until the morning of the installation, if at all, and that it affected the way they do their jobs.  (*Id.* at pp. 202-04, PgID 686.)

### 6.   Plaintiff Returns from FMLA Leave and is Placed on a PIP and Then Terminated

Pustulka reported to Whitehead her concerns about Plaintiff and the way her accounts had been handled.  (Pustulka Dep. at p. 207, PgID 687.)  She then had a second conversation with Whitehead as more issues came to light, and they began to discuss a Performance Improvement Plan ("PIP") for Plaintiff.  (*Id.* at pp. 214-15, PgID 689.)  As talks progressed, Pustulka and Whitehead involved Seppey in the discussions.  However, according to Pustulka, the fact that Plaintiff was on a medical leave never came up in those discussions.  (Pustulka Dep. at pp. 218-19, PgID 690.)

12

The three created a PIP that identified three general areas where Plaintiff's performance was below expectations: (1) how the AMG program was executed under her leadership; (2) client complaints regarding unresolved issues and unanswered emails; and (3) a reiteration of the areas of concern discussed in April 2017, including demoralized employees, improperly trained employees and her inability to assist her department and independently release jobs to the shop floor due to her lack of knowledge of Tradesoft. (ECF No. 30-14, Performance Improvement Plan ("PIP"), PgID 730-32.) The PIP also detailed a plan for improving these areas, along with expected results, including that Plaintiff: (1) expand her knowledge of her everyday tasks; (2) become proficient using the Company ERP to the level of her peers; (3) timely complete client requests and return emails; (4) competently lead a project from beginning to end; (5) rebuild effective relationships with her team; and (6) rebuild an effective relationship with her peers. (*Id.*)

Seppey and Pustulka presented the PIP to Plaintiff immediately upon her return from FMLA leave on November 1, 2017. (Berger Dep. at pp. 143-44, PgID 418; PIP, PgID 730-32.) She was given 60 days to accomplish the expectations listed, and the PIP stated that "Lack of progress after initial review may end improvement plan. Failure to meet and sustain improved performance or failure to

13

follow company policies or procedures may lead to further disciplinary action, up to and including termination."  (PIP, PgID 730-32.)  Plaintiff responded to Whitehead, Seppey and Pustulka by email the next day that she was "shocked" to receive a PIP immediately upon return from FMLA leave, that it "seems to be motivated either as a retaliation for [her] Medical Leave … or as an attempt to fire [her] without severance[,]" and she demanded the PIP be withdrawn or investigated by an outside independent person agreed upon by her.  (ECF No. 30-15, 11/2/2017 email from Plaintiff, PgID 735-36; Berger Dep. at p. 143, PgID 418.)

In subsequent November 3, 2017 emails, Plaintiff stated "[n]ever has someone communicated to me that I am an inadequate leader who demoralizes my team, nor that I am an unsuccessful, non-productive member of the larger IMB team" and that she "look[s] forward to tackling this PIP and showcasing improvements to becoming more successful within the IMB organization.  I will set up a meeting with Lindsay to clarify my next steps to meet her expectations."  (*Id.*, 11/3/2017 emails from Plaintiff, PgID 734-35.)  She also attached a written response to the PIP.  (*Id.*)

In her November 3, 2017 written response to the PIP, Berger acknowledged that the statement that she needed to be more proficient in Tradesoft is accurate, but disputed the accuracy of the remaining issues raised in the PIP.  (ECF No. 32-11, PIP Employee Comments, PgID 1243-44.)  She found it "incomprehensible that

complaints discussed between Robin and Jim/Craig and [her]/Craig in April … from 7 months ago" were included, and stated that she did become more proficient in Tradesoft after the April 2017 meeting.  (*Id.* at p. 2, PgID 1243.)  She stated that "there was <u>NEVER</u> any mention of dissatisfaction with how the [AMG] program was run" and that if "[she] had the resources that [she] requested of HR, Jim and Steve multiple times over multiple months, at the time [she] had requested them, the program would have been run quite differently" and "the client, as is suggested in this PIP, would be happier."  (*Id.* at p. 3, PgID 1244 (emphasis in original).)

According to Berger, her responsibilities changed after returning from leave, in that her direct reports effectively no longer reported to her and her largest account, AMG, was reassigned.  (Berger Dep. at pp. 160-64, 172-73, PgID 423, 425.)  She claims she reached out to Pustulka regarding her direct reports, and that instead of responding, Pustulka forwarded the email to Seppey and wrote that she has "been getting emails like these for different topics consistently" while she is "sitting right here at [her] desk," and that her "patience are [sic] running thin."  (ECF No. 32-12, 11/8/17 Email, PgID 1245.)  Plaintiff further complains that while she and Whitehead spoke regularly before her leave, Whitehead never communicated with her after her return, and that she noticed that her co-workers treated her differently after she returned from leave and employees whispered about her behind her back

and stared at her.  (Berger Dep. at pp. 168, 236-37, PgID 424, 441.)  In addition, Plaintiff alleges that Steve Ripplinger, responsible for Program Development at i.M. Branded, told her that she was on Whitehead's "bad side," and teased  her about her mental health by insinuating (with a hand gesture) that the reason she took FMLA leave was because she was "crazy."  (*Id.* at pp. 163, 168, PgID 422-24.)

According to Defendants, Plaintiff demonstrated no intention to improve her performance after being placed on the PIP, but rather sought to prove that it was inaccurate and those who put her on it were wrong.  (Def.'s Mot. at pp. 10-11, PgID 359-60, citing Berger Dep. at p. 253, PgID 445.)  Plaintiff sent emails to Pustulka challenging the decisions Pustulka was making, and then forwarded those same emails to Seppey marked "PRIVATE" and "do not share [this] with Lindsay [Pustulka]."  (ECF No. 30-16, 11/8/17 Emails, PgID 738-42.)  While Pustulka had assumed responsibility for the AMG program while Plaintiff was on leave and thereafter, because it was nearing completion (Pustulka Dep. at p. 234, PgID 694),[1] and thus Plaintiff's subordinates were working with Pustulka on that program,

---

[1] Defendant states that Plaintiff was given two other accounts to handle following her return from leave, in place of the AMG program.  (Pustulka Dep. at p. 236, PgID 694.)  As discussed below, Plaintiff disputes this, and states that she was already assigned one of those accounts several months before her leave and that "there is no evidence that [the other] account is as large and prestigious as AMG."  (Pl.'s Resp. at p. 10, PgID 789.)

Defendant claims that Plaintiff stopped communicating with her team following her return from leave.  According to Pustulka, Plaintiff's team reported that Plaintiff "hasn't spoken to us, she just walks right past us, [and we] don't feel comfortable talking with her." (Pustulka Dep. at p. 249, PgID 698.)  Pustulka states that she tried to assist Plaintiff with her relationship with her team, but Plaintiff did not take her advice and "her team stayed alienated from her."  (*Id*. at pp. 248-49, PgID 697-98.)

Defendant also states that customer complaints escalated following Plaintiff's return from leave.  Specifically, toward the end of November 2017, Whitehead became aware that a customer had received a brochure from Plaintiff with pricing that was 10 years old.  (ECF No. 30-17, 11/28/17 Customer Complaint Emails, PgID 744-55.)  The customer complained that "[i]t seems our account means very little to the people at i.M. Branded," and "I've never experienced incompetence at this level of business … [b]ut I guess I shouldn't be surprised….")  (*Id*. at PgID 745.) According to Pustulka, the Account Manager had instructed Plaintiff to call him before responding to the client, but Plaintiff disregarded that directive.  (Pustulka Dep. at pp. 243-45, PgID 696-97.)

In November 2017, Whitehead also received a complaint from Jeff Anderson, a Vice President at Penske Automotive Group (which formerly had an ownership interest in i.M. Branded and was one of its longest-standing clients), that he was

offended by the "aggressive" tone of an email Plaintiff had sent in which she

"threaten[ed]" to hold up the schedule on their installs if a deposit was not received

within the week.  (ECF No. 30-18, Penske complaint emails, PgID 757-59.)  The

Penske representative characterized Plaintiff's email as "ridiculous" because "they

just gave me the invoices last week and are already threatening us." (*Id.*)  According

to Whitehead,

> [T]his was our longest-standing … client.  So, I wouldn't expect anyone
> in the organization to say to them, "We can't keep the schedule unless
> you pay us."  I could expect them to say, "You can't keep the schedule
> unless you approve something, unless you tell us what you want."
> When it comes to payment, I would never think that anyone in the
> organization would think that we're going to, in a sense, tell Penske
> Automotive Group, "You either pay us or we're not going to make your
> schedule."

(Whitehead Dep. at pp. 164-65, PgID 515.)   Pustulka forwarded the Penske

complaint email to Berger, explained that the client "felt as though they were under

attack," but that she "know[s] that was not your intent" and suggested "in the future

you can direct the email more casually."  (Penske complaint email, PgID 757.)

Berger responded by email that she was being "proactive to manage expectations,"

but understood that she "was a little too direct" and would use "more careful

language in the future."  (*Id.*)

Following these events, Pustulka requested a meeting with Whitehead and

Seppey to discuss concerns she had and that she was "very apprehensive that change

18

was going to be made." (Pustulka Dep. at p. 260, PgID 700.) Several measures were discussed but ultimately Pustulka recommended that Plaintiff's employment be terminated. (*Id.* at p. 261, PgID 701.) Whitehead and Seppey agreed (*id.*), and Plaintiff was terminated on December 7, 2017, 24 days prior to the December 31, 2017 expiration of her PIP.

## B.    Procedural History

On April 13, 2018, Plaintiff filed this action against Defendant, alleging claims for violation of the FMLA and disability discrimination under the Michigan Persons With Disabilities Civil Rights Act ("PWDCRA"). (ECF No. 1, Compl.) Specifically, Plaintiff alleges that Defendant interfered with her rights under the FMLA by failing to restore her to the same or similar position she had before she took leave, and retaliated against her by placing her on the PIP and ultimately terminating her. (*Id.* ¶¶ 46-52, PgID 7-8.) She also alleges that Defendant perceived her as disabled because she had taken FMLA leave. (*Id.* ¶¶ 53-64, PgID 8-9.)[2]

---

[2] Defendant states in its motion that "Plaintiff's counsel represented that Plaintiff is not pursuing claims under the Michigan Persons with Disabilities Civil Right Act for failure to accommodate or for discrimination based on an actual disability." (Def.'s Mot. at p. 1, PgID 339.) Plaintiff does not dispute this in her Response. Accordingly, the Court will proceed with Plaintiff's claims for violations of the Michigan PWDCRA for discrimination based on a perceived disability and for violations of the FMLA.

On January 31, 2020, Defendant filed its motion for summary judgment, arguing that Plaintiff's claim for perceived disability fails because she cannot establish that Defendant regarded her as having a determinable physical or mental characteristic that substantially limited a major life activity, or that employment decisions were made based on a perception of a disability.  (ECF No. 30, Def.'s Mot. at pp. 16-19, PgID 364-67.)  Defendant argues that the only information it knew was the information contained on Plaintiff's FMLA Medical Certification form, and that information was only known to Seppey.  (*Id.*) Further, the information on the form that Plaintiff was "unable to perform all job functions" because she was "emotional" and suffered from "decreased effectiveness/productivity" negates any claim that her mental condition was unrelated to her ability to perform her job.  (*Id.*)  And, Defendant continues, it has articulated a legitimate, business reason for Plaintiff's discharge, and Plaintiff has not shown that Defendant's explanation was pretextual. (*Id.*)

Defendant also argues that Plaintiff cannot establish that Defendant interfered with her FMLA rights because she was not denied any time off and she was restored to an equivalent position.  (*Id.* at pp. 19-20, PgID 367-68.)  Defendant further contends that Plaintiff cannot establish that Defendant retaliated against her for taking FMLA leave because she cannot show there was a causal connection between

the FMLA leave and her termination and cannot show that Defendant's stated reasons for her termination were pretextual, and that the true reason she was terminated was because she took three weeks of FMLA leave. (*Id.* at pp. 20-22, PgID 368-70.)

Plaintiff responded to Defendant's motion on February 21, 2020, asserting that Defendant violated the FMLA by failing to restore her to the same position she had prior to taking medical leave because her post-leave position had no direct reports, her largest and most prestigious account was reassigned, and she did not have the same relationship with or access to the CEO, Whitehead. (ECF No. 32, Pl.'s Resp. at pp. 8-11, PgID 787-90.) She further contends that there is a question of fact as to whether Defendant retaliated against her for taking FMLA leave because Defendant put her on the PIP within minutes after she returned from FMLA leave and she was then terminated 37 days later, prior to the expiration of the PIP period. (*Id.* at pp. 12-13, PgID 791-92.) In addition, after returning from leave, she was told she was on Whitehead's "bad side" and Whitehead stopped communicating with her. (*Id.* at p. 14, PgID 793.) Plaintiff also argues that a jury could easily reject each of Defendant's purported reasons for terminating her and that its decisions concerning Plaintiff were clearly pretextual. (*Id.* at pp. 15-21, PgID 794-800.) Finally, Plaintiff contends that Defendant violated the PWDCRA by discriminating against her based

on a perceived disability – her mental health – because, although she agrees that only Seppey knew the reason for her leave, her coworkers treated her differently after she returned from leave. (*Id.* at pp. 21-23, PgID 800-02.)

Defendant filed a reply brief on March 6, 2020. (ECF No. 33, Def.'s Reply.) Defendant argues that Plaintiff's allegations regarding her coworkers' treatment of her are insufficient to establish that Defendant regarded her as disabled because she has failed to show that any of these individuals knew that she suffered from a mental illness, that she had taken FMLA leave for a mental health issue, or any evidence that they regarded her as having a mental health issue. (*Id.* at p. 1, PgID 1267.) Defendant further argues that Plaintiff returned to an equivalent position following her FMLA leave, and her complaints about her direct reports working with others are de minimus because she acknowledge that her team was reporting to Pustulka while she was on leave and that she was still supervising the same team when she returned. (*Id.* at pp. 2-4, PgID 1268-70.) Finally, Defendant argues that Plaintiff has failed to create an issue of fact regarding pretext because the issue is not whether Plaintiff agreed with the criticisms of Defendant's customers, vendors and employees, but whether Defendant honestly believed that the criticisms were valid and warranted the employment actions it took. (*Id.* at pp. 6-7, PgID 1272-73.)

## II.   LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley*

23

*Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).  "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).  And, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### III.   ANALYSIS

### A.   PWDCRA – Perceived Disability Claim

Plaintiff claims that Defendant discriminated against her, in violation of the Persons With Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws 37.1101 *et seq.*, because of a perceived (but not actual) disability; namely, her mental health issues necessitating her FMLA leave.  (Compl., ¶¶ 53-64.)

The PWDCRA provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual … because of a disability … that is unrelated to the individual's ability to perform the duties of a particular job or position."  Mich. Comp. Law 37.1202(1)(b).  "The plaintiff bears the burden of proving a violation of the PWDCRA."  *Peden v. Detroit*, 470 Mich. 195, 204 (2004).  To establish a prima facie case of discrimination based on a perceived disability under the PWDCRA, Plaintiff is required to prove that: (1) she was regarded as having a determinable physical or mental characteristic; (2) that the perceived characteristic was regarded as substantially limiting one or more of her major life activities; and, (3) the perceived characteristic was regarded as being unrelated to her ability to perform the duties of her particular job or position or to her qualifications for employment or promotion.  *Michalski v. Bar-Levav*, 463 Mich. 723, 735 (2001).  A perceived disability is typically "one that pertains to a disability with some kind of unusual

25

stigma attached, often a mental disability, where negative perceptions are more likely to influence the actions of an employer." *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 475 (1999).

If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate business reason for discharge. *Aho v. Dep't of Corrs.*, 263 Mich. App. 281, 289 (2004). If the defendant articulates a legitimate business reason for discharging the plaintiff, the burden shifts back to the plaintiff to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge. *Id.*

### 1.    Whether Plaintiff is "Regarded As" Disabled

Defendant argues that Plaintiff cannot establish that Defendant regarded her as having a determinable physical or mental characteristic that limited a major life activity because she admits that she never told anyone that she suffered from anxiety, depression, or any other mental health disability. (Def.'s Mot. at pp. 16-17, PgID 364-65, citing Berger Dep. at pp. 124-25, 127, PgID 413-14.) Defendant contends that the only information available to it was the information contained on Plaintiff's FMLA Medical Certification Form - that Plaintiff complained of experiencing "tightness in chest, emotional [sic], interference with daily activities including sleep, decreased effectiveness/productivity," and that it was anticipated that she would be

off work for three weeks – and that information was knowns only to Seppey and not shared with anyone else in the Company.  (*Id*. citing Seppey Dep. at pp. 126-27, PgID 571; FMLA Medical Certification Form, PgID 721-28.)

In her Response, Plaintiff agrees that at the time she took her FMLA leave, only Seppey knew it was for mental health reasons.  (Pl.'s Resp. at p. 22, PgID 801.) She does not present any evidence that Seppey, or anyone else at Defendant, particularly Whitehead or Pustulka, were aware of any specific medical condition or diagnosis.  Rather, she complains generally that her coworkers treated her differently, stared at and whispered about her behind her back, Whitehead ignored her at meetings, and that one coworker made an offensive hand gesture signaling that she was "crazy."  (Pl.'s Resp. at pp. 22-23, PgID 801-02.)

It is well settled that "[g]eneral awareness of an employee's having taken medical leave is not the same as knowledge of that employee's specific medical condition." *Briggs v. Delta Air Lines, Inc.*, 353 F. Supp. 3d 641, 649-50 (E.D. Mich. 2019) ("Proof that Mr. Brimberry[] knew of Ms. Briggs' medical leave does not establish that he regarded her as having a particular disability."), citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) ("A prima facie case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a

disability exists."). Thus, Seppey's, Whitehead's and/or Pustulka's general awareness that Plaintiff took a medical leave does not create a genuine issue of fact as to whether they regarded her as disabled under the PWDCRA. *See Cook v. DTE Energy Corp. Servs., LLC*, No. 339879, 2018 WL 4927093, at *6 (Mich. App. Oct. 2, 2018) (per curiam) (evidence that supervisor knew that the plaintiff "had episodic physical impairments did not establish a question of fact as to whether DTE regarded [plaintiff] as disabled") (citing *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 479-80 (1999) (explaining that temporary, intermittent, or episodic impairments – even if they require extensive leave from work – do not constitute disabilities within the meaning of the act)).

Further, Plaintiff's subjective belief that she was treated differently based on a perceived disability is not sufficient to survive summary judgment, in the absence of any evidence that the decisionmakers regarded her as having a disability. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 519 (6th Cir. 2009) (holding that "conclusory statements, subjective belief, or intuition cannot defeat" a summary judgment motion); *Canning v. FCA US LLC*, No. 15-14390, 2017 WL 4918521, at *7 (E.D Mich. Oct. 31, 2017) (holding plaintiff's "subjective perceptions of her coworkers actions" insufficient to survive summary judgment); *see also Gibbs v. Michigan Bell Co.*, No. 18-13602, 2020 WL 1640160, at *8 (E.D. Mich. Apr. 2,

2020) (noting that "Plaintiff has provided no case law establishing that the use of FMLA leave in and of itself is sufficient to prove the employer perceived the employee was disabled under the PWDCRA.").[3]

Accordingly, the Court finds that Plaintiff cannot establish the first prong of her prima facie case - that Defendant regarded her as having a determinable physical or mental characteristic that substantially limited a major life activity- and her PWDCRA claim fails.

### 2. Whether Plaintiff's "Perceived Disability" is Unrelated to Her Ability to Perform Her Job

Defendant further argues that Plaintiff cannot show that the perceived characteristics were regarded as being unrelated to her ability to perform her

---

[3] *Hoover v. Chipotle Mexican Grill, Inc.*, No. 1:16-cv-810, 2018 WL 3092902 (S.D. Ohio June 22, 2018), relied upon by Plaintiff in her response brief, is distinguishable. In *Hoover*, the plaintiff was formerly diagnosed with "adjustment disorder with mixed anxiety and depressed mood" after he used social media to stage a fake kidnapping, and his coworkers, alerted to the social media post, had gathered to search for him. *Id.* at *1. Plaintiff took a week off from work after the incident, and then testified that his supervisors and coworkers began treating him differently upon his return, called him "mentally unstable" and said he had a "mental illness of some sort." *Id.* at *1-2. One coworker believed plaintiff was fired for having a mental illness and having a breakdown and his general manager informed him he was firing him "before you go into, like, another mental breakdown like you had before." *Id.* at *1-2, 4. The court found the evidence created a genuine issue of fact as to whether Plaintiff was regarded as disabled. *Id.* Thus, contrary to the instant case, the plaintiff's coworker's and supervisors in *Hoover* not only knew of his mental illness, there was summary judgment evidence that his mental illness influenced his termination.

particular job duties.  Mich. Comp. Laws 37.1103(A)(i).  According to the FMLA Medical Certification Form, Plaintiff was "unable to perform all job functions" because she was "emotional" and suffered from "decreased effectiveness/productivity," (FMLA Med. Cert. Form, PgID 721-28), and Plaintiff testified that she was "crying at work" and that her mental health condition caused a decrease in her effectiveness and productivity "at work."  (Berger Dep. at pp. 136-38, PgID 416-17.)   The summary judgment evidence thus demonstrates that Plaintiff's mental condition was related to her ability to perform her job due to stress from the job.  *See Dean v. City of Bay City*, No. 281847, 2009 WL 1439002, at *12 (Mich. App. May 21, 2009) (plaintiff failed to establish a prima facie case of disability discrimination because he admitted that the perceived disability (alcohol and drug use) was related to his ability to work).

Plaintiff fails to address this argument in her Response and thus has offered no evidence to the contrary.  Accordingly, Plaintiff fails to demonstrate that alleged perceived disability – her mental condition – is unrelated to her ability to perform her particular job duties, and therefore has failed to satisfy this element of her prima facie case.  *See Degiulli v City of Taylor*, No. 317681, 2014 WL 7338890, at *5 (Mich. App. Dec. 23, 2014) (holding plaintiff failed to state a claim because "[t]he record demonstrates that defendant regarded plaintiff's perceived mental condition

30

as related to his ability to perform as a [public safety officer]" and "[p]laintiff offered no evidence to the contrary").

Because Plaintiff cannot establish a prima facie case of discrimination under the PWDCRA based on a perceived disability, Defendant is entitled to summary judgment on this claim.

### B.    FMLA – Interference and Retaliation Claims

Plaintiff claims that Defendant violated the Family and Medical Leave Act ("FMLA").  The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee exercising FMLA rights.  29 U.S.C. § 2615(a)(1)-(2).  The Sixth Circuit recognizes two distinct theories of recovery for FMLA wrongdoing: (1) the "entitlement" or "interference" theory, which prohibits an employer from interfering with an employee's exercise of her FMLA rights or wrongfully denying those rights, and requires the employer to restore the employee to the same or an equivalent position upon her return from FMLA leave; and (2) the "retaliation" theory, which prohibits an employer from taking any adverse action against an employee for exercising or attempting to exercise her rights under the Act. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).  "A plaintiff proceeding under a retaliation theory must show discriminatory

or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).

### 1.   FMLA Interference Claim

To establish a claim for interference under the FMLA, Plaintiff must demonstrate that (1) she is an eligible employee, (2) Defendant is an employer as defined under the FMLA, (3) Plaintiff was entitled to leave under the FMLA, (4) Plaintiff gave Defendant notice of her intention to take leave, and (5) Defendant denied Plaintiff FMLA benefits to which she was entitled. *Tennial*, 840 F.3d at 308. "A benefit is denied if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave." *Id.*

The FMLA requires employers to reinstate an employee who returns from FMLA leave to her previous position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A) and (B). An "equivalent position" is one that is "virtually identical to the employee's former position in terms of pay, benefits and working condition, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially

32

equivalent skill, effort, responsibility, and authority." *Callaway v. Acad. of Flint Charter Sch.*, 904 F. Supp. 2d 657, 667 (E.D. Mich. 2012) (citation omitted).

Defendant contends that Plaintiff does not claim she was denied time off under the FMLA, but instead alleges that Defendant interfered with her FMLA rights by not reinstating her to her previous position because she no longer had responsibility for the AMG account.  (Def.'s Mot. at p. 20, PgID 368.)  Defendant argues that it is undisputed that Plaintiff returned to her previous position of Director of Client Services, with the same pay, benefits and working conditions as she had prior to her leave.  While Pustulka assisted Plaintiff with the AMG account prior to her leave, took over Plaintiff's duties with respect to the AMG account while she was on leave, and kept that account when Plaintiff returned because it was nearing completion, Plaintiff was given two other accounts to handle in its place, and thus was returned to an equivalent position.  (*Id.* citing *Barton v. Zimmer, Inc.*, 662 F.3d 448, 457 (7th Cir. 2011) (plaintiff was restored to an equivalent position when two projects he had been working on were completed and he was assigned a new project upon his return).)

Plaintiff responds that she has raised a triable issue of fact as to whether she returned to an equivalent position because she contends that her three direct reports no longer reported to her after she returned from leave.  (Pl.'s Resp. at p. 9, PgID

788.)  She further contends that her largest account, AMG, was reassigned to another employee, and her relationship with Whitehead changed because he stopped talking to her and ignored her in meetings.  (*Id.* at pp. 9-10, PgID 788-89.)  She also disputes that she was given two new accounts, because one account (the "PAG" account) was already assigned to her team before her leave (ECF No. 30-8, 4/21/17 Talking Points, PgID 610), and she asserts that "there is no evidence that [the "PTL" account] is as large and prestigious as AMG."  (Pl.'s Resp. at p. 10, PgID 789.)

In its Reply brief, Defendant argues that since the AMG program was nearing completion, it made sense for Pustulka to see the project through to completion, and for Plaintiff's team of project managers to work directly with Pustulka on that program, in addition to their other duties with Plaintiff.  (Def.'s Reply at pp. 2-3, PgID 1268-69.)  Defendant further asserts that the record evidence establishes that Plaintiff was still supervising the same team of three after her return from leave:

- I believe Eric, Lisa and Robin ***still report to me …***
- As ***my direct employees***, I would like to understand their commitments to you.  I believe that to be fair and open communication so I can work ***with my team*** moving forward.
- What if there was a fire and I could not account for [Fontiera's] whereabout ***since he reports to me …***

(11/8/17 Emails (emphases added), PgID 738-42.)  Defendant contends therefore that having Pustulka and the Project Managers finish up the AMG project does not

constitute a failure to reinstate Plaintiff to her previous or an equivalent position. (*Id.* at pp. 3-4, PgID 1269-70.)

Because it is undisputed that Plaintiff returned to the same position, with the same pay and benefits, the issue is whether the position she returned to was equivalent in status to her prior position. That Plaintiff's job duties with regard to her responsibilities for specific ongoing accounts might change or differ following her return from leave is not unexpected. Defendant explained that business needs unrelated to Plaintiff's leave required that the accounts, and particularly the AMG account, which was nearing completion, be managed and updated during Plaintiff's leave. A restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). And contrary to Plaintiff's testimony that her direct reports were "effectively" taken away because they were busy working with Pustulka on the AMG project, she acknowledged that she still had her team, even if that relationship was strained. (11/8/17 Emails, PgID 738-42.) That Plaintiff no longer had responsibility for the AMG account does not render her position on return "not equivalent." Indeed, Pustulka had taken over additional responsibilities with the AMG account, including working with Plaintiff's reports, well before Plaintiff even

requested FMLA leave. (Pustulka Dep. at pp. 95-96 158-59, PgID 643, 675.) Plaintiff's personal perception that the AMG account was more prestigious than other accounts does not suffice to render her positions "not equivalent." Defendant was not required to return her to the "identical" job or account responsibilities she had before her leave, but rather to an equivalent position. She returned to her prior position, with the same pay and benefits and essentially equivalent responsibilities.

The cases Plaintiff relies on in her Response brief are readily distinguishable because the plaintiffs in those cases were returned to materially different positions. In *Nocella v. Basement Experts of America*, 499 F. Supp. 2d 935 (N.D. Ohio 2007), the plaintiff was moved from an office manager position with supervisory authority to an I-9 review position, which had no such supervisory authority. *Id.* at 942 (recognizing that plaintiff was "moved from the middle of a chain of command to the bottom of another"). In *Callaway v. Academy of Flint Charter School*, 904 F. Supp. 2d 657 (E.D. Mich. 2012), the plaintiff was demoted from a Sixth Grade classroom teacher to a non-classroom position answering phones, signing kids in, hanging stuff up in the hall, and running memos. And, in *Donahoo v. Master Data Center*, 282 F. Supp. 2d 540 (E.D. Mich. 2003), the plaintiff was demoted from a computer analyst position to a data-entry position which was not as sophisticated and did not require a similar level of training or education.

Accordingly, Plaintiff has failed to present summary judgment evidence creating a genuine issue of material fact that she was not returned to the same or an equivalent position upon her return from FMLA leave. Plaintiff therefore cannot establish a prima facie case of FMLA interference and Defendant is entitled to summary judgment on Plaintiffs FMLA interference claim.

### 2.    FMLA Retaliation claim

To establish a prima facie case of FMLA retaliation, Plaintiff must show that: (1) she was engaged in an activity protected by the FMLA; (2) Defendant knew that she was exercising rights under the FMLA; (3) after learning of her exercise of FMLA rights, the Defendant took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2013). If Plaintiff makes that showing, the burden shifts to Defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. And if Defendant succeeds, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for unlawful discrimination. *Id.* To prove the proffered reason was pretext, Plaintiff must show that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendant's challenged conduct, or (3) was

insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

### a.      Plaintiff can establish a prima facie case of retaliation

For purposes of its motion for summary judgment, Defendant does not dispute the first three prongs of Plaintiff's prima facie case. (Def.'s Mot. at p. 21, PgID 369.) Rather, Defendant argues that Plaintiff's FMLA retaliation claim fails because she cannot establish a causal connection between her use of FMLA leave and an adverse employment decision. (*Id.* at pp. 21-22, PgID 369-70.) Defendant recognizes that Plaintiff primarily relies on the timing of her PIP, and subsequent termination, to establish causation, and also concedes that temporal proximity may suffice to establish the causation element of a prima facie retaliation claim, but argues that temporal proximity alone is not sufficient to overcome Plaintiff's burden of establishing pretext. (*Id.* citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283-84 (6th Cir. 2012).)

Plaintiff argues that the Sixth Circuit has held that "temporal proximity alone is sufficient to establish a prima facie case of FMLA retaliation." *See Johnson v. Fifth Third Bank*, 151 F. Supp. 3d 763, 770 (E.D. Mich. 2015), *aff'd*, 685 F. App'x 379 (6th Cir. 2017). Plaintiff states that the "first retaliatory action" against her, the PIP, occurred just minutes after she returned from protected leave, and that the

"second action," her termination, followed 37 days later, and prior to the expiration of her PIP. (Pl.'s Resp. at p. 13, PgID 792.) Plaintiff argues that the Sixth Circuit has held that both of these time periods are well within the range to find temporal proximity for purposes of establishing a prima facie case. (*Id.*, citing *Seeger*, 681 F.3d at 283 (an adverse employment action taken three weeks after the employee's reinstatement and less than two months after he first notified his employer of his FMLA leave meets "the low threshold of proof necessary to establish a prima facie case of retaliatory discharge."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (three months from FMLA leave to adverse action was sufficient to show temporal proximity and noting that a plaintiff's burden to establish a prima facie case is not "onerous").)

The Court finds that the very short time period between Plaintiff's return from leave and her placement on the PIP, and her subsequent termination 37 days later, meets the low threshold for establishing a prima facie case of FMLA retaliation. *See Johnson*, 151 F. Supp. 3d at 770; *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for purposes of establishing a prima facie case of retaliation.").

### b.   Defendant has proffered a legitimate, nondiscriminatory reason for its actions

Defendant asserts that it has articulated a legitimate business reason for the adverse employment actions – "the complaints it received from staff, customers, and vendors, and Plaintiff's admitted refusal to improve her performance." (Def.'s Mot. at p. 22, PgID 370.)   Plaintiff does not dispute that Defendant has proffered a legitimate, business reasons for its actions; rather, she asserts that the reasons, as discussed below, are pretextual.   Accordingly, the Court finds that Defendant has met its burden to articulate a legitimate business reason for the adverse employment actions.

### c.   Plaintiff has presented sufficient evidence of pretext

Defendant's proffer of legitimate and nondiscriminatory reasons for Plaintiff's termination shifts the burden back to Plaintiff to show that these reasons are merely a pretext for FMLA retaliation.   As explained above, a plaintiff can rebut the employer's proffered reason by showing that the given reason(s): (1) had no basis in fact, (2) did not actually motivate the adverse decision, or (3) was insufficient to warrant the adverse decision.   *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

Defendant argues that Plaintiff contends, through her deposition testimony, that Defendant's concerns regarding her performance have no basis in fact.  (Def.'s

Mot. at pp. 22-23 & fn.17, PgID 370-71) (contending that there is no record evidence suggesting that Defendant's concerns regarding Plaintiff's performance did not motivate the employment actions or were insufficient to warrant the employment actions).)  According to Defendant, Plaintiff "felt that her role was diminished and that information was willfully kept from her" and that "in her opinion, she was a 'stellar employee who did a great job on all of [her] accounts,'" and she "primarily relies on the timing of her PIP, and the fact that it was issued to her on her first day back from FMLA leave." (*Id.* at p. 21, citing Berger Dep. at p. 153.)  And, Defendant continues, even if its performance concerns were factually inaccurate, it argues it is entitled to summary judgment based on the "honest belief" doctrine, which provides that "[i]if the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." (*Id.* at pp. 23-24, citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).)  Defendant asserts, without further elaboration, that Plaintiff has no evidence that Whitehead and Pustulka did not honestly believe what Defendant's employees, customers, and vendors were telling them.  (*Id.*)

41

The Court notes, initially, that although temporal proximity between the protected FMLA activity and the adverse action can be sufficient to establish Plaintiff's prima facie case, such "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001); *see also Seeger*, 681 F.3d at 285 ("Unlike its role in establishing a *prima facie* case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.") (internal quotation marks and citation omitted). "However, suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger*, 681 F.3d at 285 (internal quotation marks and citations omitted). In this case, Plaintiff was placed on a PIP minutes after she returned from FMLA leave, and then terminated 37 days later, prior to the expiration of that leave. Although perhaps, not alone sufficient to establish pretext, the highly suspicious timing of Defendant's actions is "a strong indicator of pretext." *See Seeger*, 681 F.3d at 285.

Plaintiff argues in response she has ample additional evidence of pretext. (Pl.'s Resp. at p. 13, PgID 792.) Here, Plaintiff seeks to demonstrate pretext by showing that Defendant's proffered reasons have no basis in fact. This is

> essentially an attack on the credibility of the employer's proffered reason … [and] consists of showing that the employer did not actually

42

have cause to take adverse actions against the employee based on its proffered reason, and thus, that the proffered reason is pretextual. Thus, this Circuit has adopted the "honest belief rule." Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held.

*Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006).

Under the honest belief rule, the employer is entitled to reasonably rely on a particularized set of facts that were before it when the adverse decision was made, and this holds true even if the decision is "later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). But the Court must examine carefully an employer's reasons for adverse employment actions:

[C]ourts … [should not] blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).

Plaintiff acknowledges, as she must, that temporal proximity alone may be insufficient to prove pretext, and argues that in addition to the "suspicious timing of her PIP and termination" relative to her FMLA leave, her coworker told her that she

43

was on Whitehead's "bad side" and that Whitehead stopped communicating with her and ignored her at meetings after she returned from leave. (Pl.'s Resp. at p. 14, PgID 793.) She also testified that no performance issues were discussed prior to her FMLA leave, and that shortly before her termination, Seppey met with her to review her personnel file and told her "I don't understand why you took medical leave." (Berger Dep. at p. 181, PgID 427.) Plaintiff further argues that a jury could reject each of Defendant's purported reasons for terminating her employment because these reasons were either fabricated by Defendant, or did not actually motivate its decision to terminate her. (Pl.'s Resp. at pp. 15-19, PgID 794-98.) Specifically, Plaintiff points to five pieces of evidence to establish pretext. Plaintiff further argues that Defendant cannot hide behind the honest belief rule because Defendant's reasons concerning her were so clearly pretextual. (*Id.* at pp. 20-21, PgID 799-800.)

Viewing the record evidence in the light most favorable to Plaintiff, the Court finds that she has raised a triable issue of fact regarding whether Defendant's stated reasons for its actions were mere pretext, because, as explained below, in addition to the suspicious timing of the adverse employment decisions and Plaintiff's FMLA leave, Plaintiff has presented evidence that calls into question whether many of the enumerated reasons for her termination were reasonably informed and worthy of credence.

First, Plaintiff disputes she sent an "aggressive" and "threatening" email to Defendant's long-time client, Penske, and instead claims that she sent a professional email in line with Defendant's policy and, importantly, at the direction of Whitehead.  (Pl.'s Resp. at pp. 15-16, PgID 794-95.)  She presents evidence that Whitehead had previously directly instructed Berger that she needed to get deposits from all clients before any work is done, stating in an email prior to Plaintiff's correspondence with Penske, with a subject line of "Deposits for Penske," that "Moving forward, it will be critical that we are collecting deposits on ALL projects unless specifically approved by myself."  (ECF No. 32-14, PgID 1248-49.)  She further stated that Whitehead had previously criticized one of her colleagues for failing to collect deposits from this same client.  (Berger Dep. at pp. 177-78, PgID 426-27.)  Plaintiff thus has presented summary judgment evidence calling into question the credence of this reason for her termination.

Second, Plaintiff disputes that she alone is responsible for sending an outdated brochure to a client and claims instead that others were responsible for sending the client incorrect information, but they were not disciplined.  (Whitehead Dep. at pp. 167-68, 211-12, PgID 516, 527 (admitting that two other employees were also involved in this issue).)  Specifically, she explains that an i.M. Branded sales representative named Brady Quick had previously improperly sent the client wrong

samples that were not yet available. (Berger Dep. at p. 206, PgID 434.) The Project Manager overseeing this account, LaFramboise, was responsible for ensuring that Quick sent the correct samples but failed to do so. (*Id.* at pp. 206-08, PgID 434.) On November 27, 2017, when Plaintiff was covering for LaFramboise (who was out of the office), the client contacted her to place the order, and when Plaintiff could not find any information for that order after searching LaFramboise's desk, she contacted Quick for assistance. (*Id.*) Quick did not have an answer and instructed Plaintiff to contact the client for more information, which she did, resulting in the client becoming frustrated because of the apparent lack of communication between the departments. (*Id.*) Plaintiff further notes that Whitehead acknowledged to the client that the Company as a whole made several mistakes and that the client did not complain that Plaintiff specifically was responsible for the issues. (Whitehead Dep. at pp. 167-68, 177-78, PgID 516, 518-19.) As above, this summary judgment evidence calls into question the credence of Defendant's proffered reason for Plaintiff's termination.

Third, Plaintiff disputes that her subordinates complained about her leadership because Whitehead told her in April 2017 to "disregard everything" regarding Ellis' purported complaints and that over 95% of those complaints were just "sour grapes." (Berger Dep. at pp. 94, 146, PgID 406, 419.) Accepting Plaintiff's testimony as true,

46

as the Court must in deciding this motion for summary judgment, to now claim that the April 2017 complaints were grounds for Plaintiff's termination is pretextual. Plaintiff also contends that no rational juror would conclude that purported complaints by other subordinates were the reason for her termination because she contends these employees no longer reported to her after she returned from her leave. Even crediting these subordinate complaints in November 2017 as true, an issue of fact remains as to whether those complaints alone defeat Plaintiff's showing of pretext as to Defendant's remaining purported reasons for her PIP and termination, particularly in light of the suspect timing of Plaintiff's leave and her placement on a PIP and termination.

Fourth, Plaintiff disputes that there were problems with the AMG account or that those problems were solely her fault. Plaintiff was no longer working on the AMG project after returning from FMLA leave, and so any issues with that account arising after she returned from leave were not Plaintiff's responsibility. And, to the extent there were issues with the account prior to her leave, Plaintiff explained that she had been alerting Whitehead to potential problems with the project prior to her leave, requesting assistance, and then worked with Pustulka starting in September 2017 on that account. (Pl.'s Resp. at pp. 18-19, PgID 797-98.) Further, Pustulka admitted that Plaintiff was not responsible for all of the problems with the AMG

account (Pustulka Dep. at p. 210, PgID 688 (admitting that "her performance was – played a part in the issues at hand" but "[s]ome issues … were out of our control")), and Ripplinger admits that it is common for vendors such as JLL to complain about i.M. Branded.  (ECF No. 32-16, Steve Ripplinger Deposition Tr. at p. 22, PgID 1258.)  And, at the end, AMG was very happy with Defendant's work at the conclusion of the project, writing that "the entire team at i.M. Branded was great. They were well organized, very friendly and the result came out perfectly."  (ECF No. 32-17, AMG Article, PgID 1263-64.) Accordingly, viewing the record in the light most favorable to Plaintiff, there is a question of fact as to whether the issues with the AMG account supported the decision to terminate Plaintiff following her return from FMLA leave.

Finally, Plaintiff denies that Whitehead told her in April 2017 that "she would get fired" if she did not improve her performance in April 2017.  (Pl.'s Resp. at pp. 19, PgID 798.)  Defendant, however, agrees that it did not make this claim, but instead told her, months before she requested to take FMLA leave, that she needed to improve her Tradesoft skills.  (4/21/2017 Seppey Notes.)  Plaintiff states that she did so.  (Berger Dep. at pp. 189-91.)

"When the employees is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before

48

taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith*, 155 F.3d at 806-07.   Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has presented evidence to allow a reasonable jury to conclude that Defendant's decision-making process was not worthy of credence. *See Czerneski v. American Blue Ribbon Holdings, LLC*, No. 12-cv-12417, 2014 WL 1118436, at *11 (E.D. Mich. Mar. 20, 2014) ("[A] reasonably informed and considered decision cannot be found where there is no documentation or corroboration of Plaintiff's alleged repeated shortcomings or evidence of persistent … [issues.]  To the contrary, the only documentary evidence regarding Plaintiff's historical performance belies Defendant's allegations and indicates Plaintiff's performance was satisfactory.").  Based on the above discussion, the Court finds that there is conflicting evidence in the record regarding whether Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff was a pretext for discrimination.  The issue of the suspect timing of the employment actions at issue, combined with the factors described above, constitute sufficient evidence  to allow a jury to determine whether Defendant's proffered reasons are valid.

Accordingly, Plaintiff has demonstrated a genuine issue of material fact regarding whether Defendant retaliated against her for exercising her FMLA rights, and her FMLA retaliation claim survives summary judgment.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Specifically, it is GRANTED as to Plaintiff's PWDCRA and FMLA interference claims, and DENIED as to Plaintiff's FMLA retaliation claim.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: June 12, 2020